**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

| | |
|---|---|
| MESHELL TAYLOR, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) 11 CV 2167 |
| The CITY OF BERWYN, Illinois, a | ) |
| Municipal corporation, Berwyn Police | ) |
| Officers ANTHONY GENNET (#249), | ) Judge |
| RAMON ORTIZ (#289), ROBERT SEPE | ) |
| (#241), J. KENNY (#248), and JOHN | ) Magistrate Judge |
| O'HALLORAN, LANGLEY | ) |
| PRODUCTIONS, INC. a California | ) |
| Corporation, one UNKNOWN | ) |
| TELEVISION SHOW AGENT, and | ) |
| UNKNOWN LAW ENFORCEMENT | ) |
| OFFICERS, | ) |
| | ) |
| Defendants. | ) |

## COMPLAINT

Plaintiff, MESHELL TAYLOR, by and through her attorneys, The Hamilton Law Office, LLC, makes the following complaint against Defendant CITY OF BERWYN, and Berwyn Police Officers ANTHONY GENNET, RAMON ORTIZ, ROBERT SEPE, J. KENNY, and JOHN O'HALLORAN, LANGLEY PRODUCTIONS, INC., one UNKNOWN TELEVISION SHOW AGENT, and UNKNOWN LAW ENFORCEMENT OFFICERS ("Unknown Officers"):

## JURISDICTION AND VENUE

1. This action is brought pursuant to 42 U.S.C. § 1983 to redress the deprivation under color of law of Plaintiff's rights as secured by the United States Constitution as well as under Illinois common law.

2. This Court has jurisdiction of the action pursuant to 28 U.S.C. §§ 1331, 1343 and 1367.

3. This Court also has diversity jurisdiction over this matter since the amount in controversy exceeds $75,000, and while Plaintiff is a resident of Chicago, Illinois, Defendant LANGLEY is incorporated and maintains its usual place of business in the state of California.

4. Venue is proper under 28 U.S.C. § 1391(b). All parties, but Defendant LANGLEY, reside in this judicial district and the events giving rise to the claims asserted in this complaint occurred within this district.

## PARTIES

5. Plaintiff Meshell Taylor ("Plaintiff") is a forty-nine-year-old resident of Chicago, Illinois.

6. Defendants ANTHONY GENNET, RAMON ORTIZ, ROBERT SEPE, J. KENNY, and JOHN O'HALLORAN, ("Berwyn Officers"), are or were, at all relevant times, Berwyn Police Officers, employed by the CITY OF BERWYN, acting within the scope of their employment, and under color of law.

7. On information and belief, Defendant UNKNOWN LAW ENFORCEMENT OFFICERS ("Unknown Officers") were law enforcement officers employed by various unknown police agencies in the Chicago area, and either assigned by their respective agencies to the "Great Lakes Fugitive Task Force," or working in cooperation with one or more BERWYN OFFICERS, at all times relevant to Plaintiff's complaint. Defendant UNKNOWN OFFICERS were at all times acting within the scope of their employment with their respective police agencies, and under color of law.

8. The CITY OF BERWYN, ILLINOIS, ("Defendant City"), is a municipal corporation, duly incorporated under the laws of the State of Illinois, and at all relevant times, is or was the employer and principal of BERWYN OFFICERS.

9. On information and belief, Defendant UNKNOWN TELEVISION SHOW AGENT, ("Unknown Agent") is or was an employee or agent of the COPS television show and/or

2

LANGLEY PRODUCTIONS, INC. and was, at all relevant times, acting in the scope of that employment.

10. Defendant LANGLEY PRODUCTIONS, INC, ("Defendant Langley"), is a California Corporation, duly incorporated under the laws of the state of California, and having its usual place of business at 1111 Broadway, in Santa Monica, California, 90401, and is or was the employer and principal of the UNKNOWN AGENT, and the producer of the COPS television show. Defendant Defendant LANGLEY's registered agent is Michael D. Schwartz, 21031 Ventura Boulevard, Suite 1110, in Woodland Hills, California, 91364.

## FACTS

### Plaintiff's Older Son Is Arrested

11. On the evening of May 19, 2009, two of Plaintiff's sons, Kentrell Taylor (age 19) and John Doe[1] (age 15), left Plaintiff's home together in Plaintiff's car. Sometime after Plaintiff went to bed, Kentrell Taylor dropped his younger brother off at home and left again.

12. Later that night, shortly after midnight on May 20, 2009, Kentrell Taylor was driving his mother's car in Berwyn, Illinois, and his friend Fernando Lopez was riding in the passenger seat, when they were pulled over by Defendant GENNET for an expired license plate sticker.

13. After he was pulled over, Kentrell Taylor, gave his younger brother's name, (John Doe), and claimed not to have a driver's license or any other forms of identification.

14. On information and belief, Defendant SEPE assisted Defendant GENNET with the stop and/or arrest and processing of Kentrell Taylor.

15. Defendant GENNET and/or SEPE released Kentrell Taylor's passenger, Fernando Lopez, without charges, but arrested and cited Kentrell Taylor for driving without a driver's license

---

[1] In keeping with Federal Rule of Civil Procedure 5.2, the name of Plaintiff's younger son has been replaced in this complaint with "John Doe" because he is still a juvenile.

or proof of insurance, and for displaying an expired registration sticker. The citations, however, were issued to John Doe, not to Kentrell Taylor.

**Plaintiff Reasonably Believes They Have Arrested Her Younger Son**

16.     Sometime after Kentrell Taylor's arrest, Plaintiff received a telephone call from a Berwyn police officer asking her to come to the Berwyn Police Station because her juvenile son, John Doe, had been arrested driving her car without a license and was being held there.

17.     Plaintiff who had been in bed asleep when she received this call, ran out of her house quickly while still on the phone with the Berwyn police officer. Plaintiff's fiancé accompanied Plaintiff and drove her directly to the Berwyn police station.

18.     At the station, Plaintiff was not allowed to see her son, but was told to wait for the arresting officer. Plaintiff and her fiancé waited in the car outside the police station.

19.     A short time later, Defendant GENNET came out of the police station and had a conversation with Plaintiff about her son John Doe.  Defendant GENNET complimented Plaintiff on her son's manners and explained why he had been arrested.  Detective GENNET told Plaintiff that her son's passenger had been released without charges. Defendant GENNET told Plaintiff she would need $200 to bond her son out, and that once his fingerprints cleared, she could take him home.

20.     Plaintiff asked her sister to bring $200 to the Berwyn Police Department, and her sister arrived shortly thereafter to wait with Plaintiff and her fiancé.

21.     Approximately an hour to an hour and a half later, around 2:00 a.m., either Detective GENNET or another police officer came outside to where Plaintiff, her fiancé and her sister were waiting by the car, and informed Plaintiff she could bond her son out now.

22.     Plaintiff went inside the police station and signed John Doe's bond form because he was

a minor, as instructed by the officer behind the desk, but she still did not see her son. After signing the form, she went back outside to wait for John Doe.

23.     Shortly thereafter, Plaintiff's older son, Kentrell Taylor, walked out of the police station.

24.     Plaintiff asked her older son where John Doe was, and he told her he would explain later, or words to that effect. Kentrell Taylor then got into a waiting car and drove away.

25.     Confused and not understanding what had happened to her younger son, Plaintiff went home to look for John Doe and to make sure he was okay.

26.     When she got home, John Doe was in his bed asleep. Plaintiff's older son, Kentrell Taylor did not return to her home that night.

**Plaintiff Tries Repeatedly To Correct The Misidentification**

27.     Several hours later, at approximately 5:30 a.m. Defendant GENNET appeared at Plaintiff's front door asking for her younger son, John Doe, and claiming that there was some unfinished paperwork John Doe needed to sign in relation to his earlier arrest.

28.     Plaintiff asked Defendant GENNET if he was sure he wanted John Doe and not her older son, Kentrell Taylor. Plaintiff told Defendant GENNET she thought maybe he wanted her older son, not her younger son, and that the son he really wanted was not home and had not been home since he was released from the Berwyn Police Station. Defendant GENNET told Plaintiff she would have to bring John Doe to the police station the next day in order for her to get her car back.

29.     Later that afternoon, Plaintiff learned from her older son, Kentrell Taylor, what had actually happened the night before. Plaintiff then brought her younger son, John Doe, as instructed by Defendant GENNET, to the Berwyn police station and tried a second time to clear up the mistake. Plaintiff explained the problem to the police officer at the desk, but she did not see Defendant GENNET.

30. Plaintiff then attempted to retrieve her car, but was not allowed to do so. She explained to a third Berwyn police officer when she tried to get her car, what had happened the night before and how they were looking for her older son, not her younger one. Despite her efforts, Plaintiff was not able to get her car, or clear her younger son's name.

31. Plaintiff and her younger son, John Doe, went to court on the first scheduled court date for the Berwyn arrest, in order to clear John Doe's name.

32. On July 15, 2009, when John Doe appeared in court, the charges against him were dismissed because it was acknowledged that he was not the person Defendants GENNET and SEPE had arrested on May 20, 2009.

**Plaintiff is Arrested Half-Dressed While COPS Cameras Roll**

33. On information and belief, at some time prior to August 31 2009, a written agreement was entered into by a representative from Langley Productions and the Berwyn Police Department in order to obtain live footage of civilian arrests for use on the COPS television show.

34. Sometime between July 15, 2009 and August 31, 2009, on information and belief, one or more of BERWYN OFFICERS sought arrest warrants for Kentrell and Meshell Taylor, but did not receive the State's Attorney's approval to even seek a warrant from a judge.

35. Nevertheless, on information and belief, Defendant ORTIZ and other BERWYN OFFICERS made arrangements in cooperation with Defendant LANGLEY and/or the COPS television program to provide live footage of the arrest of Kentrell and Meshell Taylor.

36. On August 31, 2009, at approximately, 6:00 a.m. BERWYN OFFICERS, and UNKNOWN OFFICERS, who were members of the Great Lakes' Fugitive Task Force, and the Berwyn Police Department, surrounded Plaintiff's home located at 4419 West Haddon, in Chicago, Illinois, intending to arrest Kentrell and Meshell Taylor.

6

37.     UNKNOWN OFFICERS entered Plaintiff's neighbor's yards, damaging fencing and even threatening to shoot her neighbor's dog.

38.     When Kentrell Taylor left his mother's home that morning to drive John Doe and his sister to school, they were surrounded by BERWYN and UNKNOWN OFFICERS pointing guns at them. They were also surrounded by camera crews with lights and operational video equipment actively filming Kentrell Taylor's arrest.

39.     One or more UNKNOWN or BERWYN OFFICERS told Plaintiff's children they had a warrant for Plaintiff's arrest and threatened to break down the door to their home if Plaintiff did not come outside.

40.     Plaintiff, who was in bed asleep inside her home received a frantic call on her cell phone from her daughter informing her that the police were pointing guns at Kentrell and that they were threatening to break down their front door, claiming to have a warrant.

41.     Panicked, Plaintiff ran outside barefoot and wearing only a t-shirt and transparent pajama pants.

42.     Plaintiff saw multiple police officers yelling and running around her son with bright lights and cameras filming the scene.

43.     The camera crews turned their attention on Plaintiff and began filming her as well.

44.     An UNKNOWN OFFICER approached Plaintiff and asked if she was Meshell Taylor, as the camera crews filmed her, without her permission. When she answered, she was placed in handcuffs. This UNKNOWN OFFICER searched Plaintiff's person and handled Plaintiff with unnecessary force, jerking her arms and back and forth for the benefit of the television audience. Plaintiff told him she had a back injury and asked him to stop treating her so roughly, and he told her that she was a criminal and that she should have thought of that before she committed her

7

crimes. Plaintiff asked what crimes he was talking about, but he did not reply.

45.    Plaintiff asked several UNKNOWN OFFICERS and Defendant ORTIZ to be allowed to get dressed, but her request was refused.

46.    Sometime thereafter, Plaintiff was placed in the back of a police car and driven to a parking lot in Berwyn, Illinois, near the scene of her arrest where several police cars and the trucks of the camera crew were parked.

47.    In this parking lot, UNKNOWN AGENT approached Plaintiff who was seated in the back of the police car and attempted to convince her to sign a release form for both herself and her son John Doe, which would allow Defendant LANGLEY to use the footage of Kentrell and Plaintiff's arrests on the television show COPS. Plaintiff refused.

48.    Plaintiff, still barefoot and in her pajamas, was then taken to the Berwyn Police station where she was to remain for the next twenty-four hours.

**Berwyn Officers Interrogate Plaintiff And Try To Coerce Her Into Signing COPS Release**

49.    Plaintiff spent more than twenty-four hours at the police station, most of them shivering and cold, and embarrassed by being half dressed in a public place. Plaintiff was not allowed to get dressed or cover herself until sometime the following day, around 2:30 a.m., or approximately 20 hours after her arrest, when she was finally allowed to put on some clothing her daughter had brought to the police station for her.

50.    While in custody, BERWYN OFFICERS interrogated Plaintiff and her older son Kentrell Taylor, attempting to extract a statement showing that Plaintiff knew it was her older son Kentrell Taylor, and not her younger son John Doe, who had been arrested on May 20, 2009. Plaintiff refused to admit this, since it was not true.

51.    Instead Plaintiff told BERWYN OFFICERS it was Defendant GENNET who told her

8

which son they had arrested, and that she had no idea what was happening until after he was released. She further related that she had told Detective GENNET they had the wrong name when he had come to her house a few hours later asking for the wrong son. She told them she came to the police station the next day and again tried correct their mistake. Unsatisfied with this information, BERWYN OFFICERS continued to interrogate Plaintiff until she asserted her right to remain silent.

52.     BERWYN OFFICERS also pressured Plaintiff to sign the LANGLEY release form so that the COPS television show could use the footage of the Taylors' arrest on its program.  One or more BERWYN OFFICERS indicated that the criminal case would go easier for her if she signed the release. Plaintiff still refused.

53.     BERWYN OFFICERS charged Plaintiff with felony obstruction of justice and caused her to be prosecuted for this crime.

54.     On the morning of September 1, 2009, approximately twenty-four hours after her arrest, Plaintiff was taken to bond court.  Later that afternoon, after spending more than thirty hours in police custody, Plaintiff was released.

**Plaintiff's Prosecution And Defendants' Continued Efforts To Get Her to Sign the Release**

55.     Defendants ORTIZ and UNKNOWN AGENT were at Plaintiff's home the day she bonded out, their first of several attempts to cajole or coerce Plaintiff into signing a release to Defendant LANGLEY for the use the footage of her and her son's arrests for broadcast during the television show COPS.

56.     Defendants ORTIZ and UNKNOWN AGENT returned to Plaintiff's house again the following day, on September 2, 2009, and again attempted to convince Plaintiff to sign the release form.  Plaintiff again refused.

57.     Defendant ORTIZ and UNKNOWN AGENT came to Plaintiff's home one to two other times insisting she sign the form and trying to convince her to do so, despite the fact that Plaintiff never wavered in her repeated refusals.

58.     Plaintiff's felony case was pending for more than a year before her Assistant Public Defender was able to bring the case to trial.

59.     Plaintiff had to appear in Court several times. On two or three occasions, UNKNOWN AGENT and Defendant ORTIZ were also present in court. These two Defendants approached Plaintiff, even following her out of the courthouse, attempting to convince her to sign the COPS release form.  She still refused.

60.     Defendant ORTIZ, in the presence of UNKNOWN AGENT, even promised Plaintiff that if she just signed the COPS release form, they would get the felony charges against her reduced to a misdemeanor offense.  Plaintiff still refused to sign the release.

61.     In October of 2010, Plaintiff proceeded to a bench trial on the false criminal charges BERWYN OFFICERS had placed against her.  She was found not guilty.

62.     Plaintiff never signed the COPS and/or Langley Productions release form. Her older son, Kentrell Taylor, did sign the release, however. It is unknown at this time, if any portion of Plaintiff's arrest has been broadcast during an episode of the COPS television show.

### COUNT I:  §1983 False Arrest Claim

63.     Plaintiff re-alleges the preceding paragraphs as if fully restated here.

64.     As more fully described above, BERWYN OFFICERS caused Plaintiff to be arrested without a warrant, probable cause, or any other legal justification to do so, in violation of Plaintiff's rights under the Fourth Amendment to the United States Constitution.

65.     Each Defendant Officer had a reasonable opportunity to intervene to prevent the

misconduct of his fellow officers, but failed to do so.

66.     As a direct and proximate result of this false arrest, Plaintiff suffered damages, including physical and emotional damages, which will be proven at trial.

WHEREFORE, Plaintiff prays for judgment against BERWYN OFFICERS in a fair and just amount sufficient to compensate Plaintiff for the injuries she has suffered, plus a substantial sum in punitive damages, as well as costs, attorney's fees, and such other relief as is just and equitable.

## COUNT II: §1983 Excessive Force Claim

67.     Plaintiff re-alleges the preceding paragraphs as if fully restated here.

68.     As more fully described in the preceding paragraphs, the intentional conduct of UNKNOWN OFFICER towards Plaintiff after her arrest was objectively unreasonable under the circumstances, and thus constituted excessive force in violation of the Fourth Amendment to the United States Constitution.

69.     One or more Defendant Officers had a reasonable opportunity to intervene to prevent the misconduct of UKNOWN OFFICER, but failed to do so.

70.     As a direct and proximate result of UNKNOWN OFFICER's use of excessive force, Plaintiff suffered physical and emotional damages which will be proven at trial.

WHEREFORE, Plaintiff prays for judgment against UNKNOWN OFFICER in a fair and just amount sufficient to compensate Plaintiff for the injuries she has suffered, plus a substantial sum in punitive damages, as well as costs, attorney's fees, and such other relief as is just and equitable.

## COUNT III: §1983 Unlawful Search Claim

71.     Plaintiff re-alleges the preceding paragraphs as if fully restated here.

72.     As more fully described above, UNKNOWN OFFICER searched Plaintiff without a

warrant, probable cause, or any other legal justification to do so, in violation of Plaintiff's rights under the Fourth Amendment to the United States Constitution.

73.     One or more of Defendant Officers had a reasonable opportunity to intervene to prevent the misconduct of his fellow officers, but failed to do so.

74.     As a direct and proximate result of this false arrest, Plaintiff suffered damages, including physical and emotional damages, which will be proven at trial.

WHEREFORE, Plaintiff prays for judgment against UNKNOWN OFFICER in a fair and just amount sufficient to compensate Plaintiff for the injuries she has suffered, plus a substantial sum in punitive damages, as well as costs, attorney's fees, and such other relief as is just and equitable.

## COUNT IV:  §1983 Conspiracy Claim

75.     Plaintiff re-alleges the preceding paragraphs as if fully re-stated here.

76.     BERWYN OFFICERS either impliedly or expressly conspired to violate Plaintiff's constitutional rights as described above.

77.     In furtherance of this conspiracy, BERWYN OFFICERS conspired to falsely arrest and prosecute Plaintiff without probable cause, for a crime she did not commit.

78.     As a direct and proximate result of this conspiracy, Plaintiff suffered damages as described more fully above.

WHEREFORE, Plaintiff prays for judgment against BERWYN OFFICERS in a fair and just amount sufficient to compensate Plaintiff for the injuries she has suffered, plus, a substantial sum in punitive damages, as well as costs, attorney's fees, and such other relief as is just and equitable.

## COUNT V:  §1983 *Monell* Policy Claim

79.     Plaintiff re-alleges the preceding paragraphs as if fully re-stated here.

80.     The misconduct described in the preceding paragraphs of this complaint was undertaken pursuant to the policy and practice of Defendant CITY.

81.     Defendant CITY by its express or implied policy condones and encourages constitutional violations like those described above, by allowing its police officers to cooperate with a reality television show such as COPS during the exercise of their police duties. Because cameras are filming, police officers behave differently during an arrest than they would have without the cameras, in an effort to make the arrest more interesting or exciting for a television audience.

82.     By so doing, Defendant CITY, has exhibited deliberate indifference to constitutional violations arising out of the filming of police activity by television shows such as COPS, such as is described in previous paragraphs of this complaint.

83.     In this way, Defendant CITY violated Plaintiff's rights since it created the temptation and opportunity for BERWYN OFFICERS to commit the foregoing constitutional violations.

84.     As a direct and proximate result of Defendant CITY's policies and practices, Plaintiff has suffered physical and emotional damages, which will be proven at trial.

WHEREFORE, Plaintiff respectfully requests judgment against Defendant CITY in a fair and just amount sufficient to compensate her for the injuries she has suffered, plus costs, reasonable attorneys' fees, and all such other relief as this Court finds just and equitable.

### COUNT VI:  Illinois Malicious Prosecution Claim

85.     Plaintiff re-alleges the preceding paragraphs as if fully re-stated here.

86.     As more fully described above, BERWYN OFFICERS willfully and wantonly initiated criminal proceedings against Plaintiff without probable cause to believe she had committed a crime.

87.     With malice, willfulness, and/or reckless indifference to Plaintiff's rights, BERWYN OFFICERS created, or acquiesced to, false and/or inaccurate police reports, causing her to be

prosecuted for a serious felony offense.

88. In addition, BERWYN OFFICERS gave false accounts regarding their investigation to other police officers and/or Assistant State's Attorneys and/or fabricated evidence.

89. The criminal proceedings against Plaintiff were terminated in her favor, in a manner indicative of innocence.

90. As a direct and proximate result of BERWYN OFFICERS' malicious prosecution, Plaintiff suffered emotional damages.

91. Illinois law provides that public entities, such as Defendant CITY, are directed to pay any compensatory damages on a tort judgment against an employee who was acting within the scope of his or her employment.

92. At all relevant times, BERWYN OFFICERS were agents of Defendant CITY, and acting within the scope of their employment as a Berwyn Police Officers. Defendant CITY, therefore, is liable as principal for all torts committed by BERWYN OFFICERS.

WHEREFORE, Plaintiff prays for judgment against BERWYN OFFICERS and Defendant CITY in an amount reasonable to compensate her for the damages she has suffered, as well as such other relief as is just and equitable.

## COUNT VII: Illinois Intentional Infliction of Emotional Distress

93. Plaintiff re-alleges the preceding paragraphs as if fully re-stated here.

94. As more fully described above, Defendant ORTIZ and UNKNOWN AGENT's actions in attempting to pressure Plaintiff into providing her permission to COPS television show to broadcast the live footage of Plaintiff's arrest was extreme and outrageous under the circumstances.

95. Defendant ORTIZ and UNKNOWN AGENT's repeated cajoling of Plaintiff as she was only partially clothed and being held in custody and then while she was facing criminal charges,

went beyond the bounds of decency into the extreme and outrageous.

96.     Defendant ORTIZ and UNKNOWN AGENT's repeated appearances at Plaintiff's home and in the courtroom during her prosecution, and their attempts to harass her into signing a release of the footage for use on COPS was extreme and outrageous behavior.

97.     Defendant ORTIZ and UNKNOWN AGENT's unethical and illegal promise to have Plaintiff's felony charges reduced to a misdemeanor in exchange for a signed release to use the video footage of Plaintiff's arrest was extreme and outrageous conduct.

98.     Defendants ORTIZ and UNKNOWN AGENT acted willfully and wantonly in that they intended, or were recklessly indifferent towards, causing Plaintiff severe emotional distress, knowing that there was a high probability that their repeated harassment would cause her severe emotional distress and mental anguish under the circumstances.

99.     As a direct and proximate result of Defendant ORTIZ and UNKNOWN AGENT's actions, Plaintiff in fact, has suffered severe emotional distress.

100.    Illinois law provides that public entities, such as Defendant CITY, are directed to pay any compensatory damages on a tort judgment against an employee who was acting within the scope of his or her employment.

101.    At all relevant times, Defendant ORTIZ was an agent of Defendant CITY and an employee of the Berwyn Police Department, acting within the scope of his employment.  Defendant CITY, therefore, is liable as principal for all torts committed by its agent, Defendant ORTIZ.

102.    At all relevant times, both Defendant ORTIZ and Defendant UNKNOWN TELEVISION AGENT were both acting as agents for Defendant LANGLEY and the television show COPS, and they acted within the scope this employment.  Defendant LANGLEY, therefore, is liable as principal for all torts committed by its agents, Defendants UNKNOWN AGENT and

Defendant ORTIZ.

WHEREFORE, Plaintiff prays for judgment against Defendants ORTIZ, UNKNOWN AGENT, and Defendant LANGLEY, in an amount exceeding $75,000, a fair and just amount sufficient to compensate her for the injuries she suffered, plus, all such other relief as this Court finds just and equitable.

**Plaintiff demands trial by jury.**

Respectfully Submitted,

By:    /s/ Torreya L. Hamilton
Attorney For Plaintiff

HAMILTON LAW OFFICE, LLC
11 South LaSalle Street, Suite 1000
Chicago, IL 60603
312.726.3173
312.726.3157 (fax)
tlh@thehamiltonlawoffice.com
Attorney No. 6229397